Erich P. Wise (State Bar No. 63219)
erichw@fdw-law.com
Alisa Manasantivongs (State Bar No. 260227)
alisam@fdw-law.com
FLYNN, DELICH & WISE LLP
One World Trade Center, Suite 1800
Long Beach, CA 90831-1800
Telephone:  (562) 435-2626
Facsimile:  (562) 437-7555

Attorneys for Defendant, Counterclaimant, and Cross-Claimant
ING BANK N.V., as Security Agent

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| CHINA NAVIGATION CO. PTE LTD., | Case No. 8:15-cv-00859-JLS-DFM |
| Plaintiff, | **DECLARATION OF ANTONY JAMES ZACAROLI QC IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF ING BANK N.V.** |
| vs. | |
| DOLPHIN MARINE FUELS, LLC; O.W. BUNKER FAR EAST (S) PTE LTD.; O.W. BUNKER USA INC.; and ING BANK N.V., | Date: January 27, 2017 |
| | Time: 2:30 p.m. |
| Defendants. | Crtrm: 10-A |
| | Judge: Hon. Josephine L. Staton |
| AND RELATED CROSS-ACTIONS. | |

//
//
//
//

# I. INTRODUCTION

1. I am a practising member of the Bar of England and Wales, having been called to the Bar in 1987 and appointed a Queen's Counsel (a senior barrister) in 2006. I specialise in commercial and business law, with particular experience of insolvency and banking law. I attach my Curriculum Vitae as Exhibit AJZ1 to this report.

2. I have been asked to provide an opinion on a question of English law which arises in connection with proceedings pending in this Court between (among others) China Navigation Co. Pte Ltd. ("**China Navigation**"), O.W. Bunker Far East (S) PTE Ltd. ("**OWBFE**"), Dolphin Marine Fuels, LLC ("**Dolphin**") and ING Bank N.V. ("**ING**").

3. Specifically, I have been asked to comment upon the scope of the rights assigned to ING under an English Omnibus Security Agreement dated 19 December 2013 (the "**Security Agreement**") between a number of companies in the O.W. Bunker group (as chargors), including OWBFE, and ING.

# II. FACTUAL BACKGROUND

4. I have been provided with a copy of the following documents:

 (1) Complaint for Interpleader and Declaratory Relief filed June 2, 2015 (the "**Complaint**") (Doc. 1);

 (2) The Answer, Counterclaims and Crossclaim of ING to the Complaint for Interpleader and Declaratory Relief filed August 7, 2015 (Doc. 16);

 (3) USD 700,000,000 Multicurrency Revolving Borrowing Base Facilities Agreement dated December 19, 2013 (the "**Credit Agreement**") between, among others, O.W. Bunker & Trading A/S, ING and various institutions as lenders;

 (4) The Security Agreement; and

– 2 –

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

(5) Transaction documents regarding the fuel supply at issue (described immediately below).

5. I take the following summary of the relevant factual background from the foregoing documents:

(1) China Navigation, as owner of the SHENGKING (the "**Vessel**"), contracted with OWBFE for the supply of bunkers to the Vessel;

(2) The contract between OWBFE and China Navigation is contained in a Sales Order Confirmation dated October 17, 2014 (ING CN 0002-04), as revised October 30, 2014 (CN 000009-11);

(3) The Sales Order Confirmation provides that the sale and delivery of marine fuels are subject to the OW Bunker Group's Terms and Conditions of Sale for Marine Bunkers (the "**Terms and Conditions**") (ING 00601-12);

(4) Clause I.9 of the Terms and Conditions provides as follows:

*"Where Bunkers are supplied to a Vessel, in addition to any other security, the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel. It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof; including but not limited to the reasonable attorney's fees), such maritime lien afforded to the Seller over the Vessel."*

(5) Following the supply of bunkers to the Vessel, OWBFE issued to China Navigation an invoice dated October 26, 2014 for the sum of USD 90,726.06 due pursuant to the Sales Order Confirmation (ING CN 0013);

(6) OWBFE subcontracted with O.W. Bunker USA Inc. ("**OW**

– 3 –

USA") to act as an intermediary in arranging for the physical supply of the bunkers;

(7) OW USA subcontracted with Dolphin to physically supply the bunkers to the Vessel;

(8) Dolphin physically supplied the bunkers to the Vessel, for which it issued an invoice to OW USA, dated October 27, 2014, for the sum of USD 87,165.30 (ING CN 0011);

(9) Various entities in the O.W. Bunker group, including OWBFE, entered into the Security Agreement with ING in December 2013.

(10) In November 2014, OW Bunker & Trading A/S commenced in-court restructuring proceedings at the probate court in Aalborg, Denmark. Subsequently, various entities in the O.W. Bunker group have commenced insolvency proceedings in jurisdictions around the world.

### III. PRINCIPLES OF CONSTRUCTION IN ENGLISH LAW

6. The most often cited expression of the principles of construction of contracts in English courts is that of Lord Hoffmann in the House of Lords[1] in *Investors Compensation Scheme v West Bromwich Building Society*.[2] In view of its importance, I set out the relevant passage from Lord Hoffmann's speech in full as an appendix to this report. In summary, he held that interpretation of contracts is the

---

[1] The judicial committee of the House of Lords was, until October 2009 the final court of Appeal in England. In October 2009 it was replaced by the Supreme Court, and all existing Law Lords who were then members of the judicial committee of the House of Lords became justices of the Supreme Court.

[2] [1998] 1 W.L.R. 896, at pp. 912F to 913F.

– 4 –

ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties at the time of the contract. While evidence of the previous negotiations of the parties is inadmissible, the available background includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

7. In two more recent cases, the Supreme Court has provided further elaboration on the principles set out by Lord Hoffmann. In *Rainy Sky SA v Koomin Bank*[3] Lord Clarke said, at paragraph 21:

> *"21. The language used by the parties will often have more than one potential meaning. I would accept the submission made on behalf of the appellants that the exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so, the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other."*

8. At paragraphs 29-30 Lord Clarke cited with approval the following passage from the judgment of Longmore LJ in in *Barclays Bank plc v HHY Luxembourg SARL* [2011] 1 BCLC 336, at paragraph 25 "…*when alternative constructions are available one has to consider which is the more commercially sensible*."

---

3    [2011] 1 WLR 2900.

– 5 –

9. In *Arnold v Britton*[4], Lord Neuberger (giving the majority judgment) said (at para 15):

> *"When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to "what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean", to quote Lord Hoffmann in Chartbrook Ltd v Persimmon Homes Ltd [2009] AC 1101, para 14. And it does so by focussing on the meaning of the relevant words, in this case clause 3(2) of each of the 25 leases, in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions."*

10. In a subsequent passage (at para 17) Lord Neuberger warned against over-reliance on commercial common sense and surrounding circumstances, which *"…should not be invoked to undervalue the importance of the language of the provision which is to be construed. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision."*

11. Lord Clarke's elaboration in *Rainy Sky* on the principles set out by Lord Hoffmann has more recently been explained as involving the following[5]: "*The

---

[4] [2015] AC 1619.

[5] *Deutsche Trustee Company Limited v Cheyne Capital (Management) UK*

– 6 –

*starting point of that process must be the ordinary, natural and grammatical sense of the language used by the parties. The court should not, however, confine itself to a consideration of such language in isolation, but should carry out an iterative process, checking each of the rival meanings of the provision in question against the other provisions of the document and its overall scheme, and investigating their commercial consequences."*

## IV. APPLICATION OF PRINCIPLES OF CONSTRUCTION TO THE SECURITY AGREEMENT

12. By clause 2.3(a) of the Security Agreement, OWBFE (as a Receivables Chargor)[6] assigned absolutely, subject to a proviso for re-assignment on redemption, all of its "*rights, title and interest in respect of the Supply Receivables*".

13. "Supply Receivables" is defined by clause 1.1 as "*any amount owing, or to be owed, to a Receivables Chargor ... under any Supply Contract*".

14. "Supply Contract" is defined by clause 1.1 as "*any one-time contract, any contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the Group, in each case governed by English law and relating to the sale of oil products traded by the Group, as governs: (a) the contractual relationship between the relevant debtor and a Receivables Chargor at any time ... and shall in each case include any invoice issued thereunder...*"

15. By clause 5.7(b), after the Security has become enforceable, the Security Agent is empowered to exercise "*any of the rights of any Chargor in*

---

*(LLP), Deco 15 – Pan Europe 6 Limited* [2015] EWHC 2282 (Ch), per Arnold J. An appeal against this decision was dismissed by the Court of Appeal in May 2016.

[6] The "Receivables Chargors" are the entities specified in Part 1A of Schedule 1 to the Security Agreement.

– 7 –

DECLARATION OF ANTONY JAMES ZACAROLI QC  CASE NO. 8:15-cv-00859-JLS-DFM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF ING BANK N.V.

*connection with any Security Asset*". "Security Asset" is defined in clause 1.1 as "*all assets and rights, title and interest of each Receivables Chargor ... which are the subject of any security created by this Deed.*"

16. The word "assets" is defined by clause 1.2(e) to include all present and future properties, revenues and rights of every description.

17. My view as to the construction of clause 2.3(a) of the Security Agreement is based primarily on the words the parties have chosen to use in the agreement, and the purpose of the agreement, to be gleaned from its provisions as a whole.

18. It is important to note that the subject matter of the assignment in clause 2.3(a) is all rights, title and interest "*in respect of*" the amounts owing or to be owed under any Supply Contract. Rights, title and interest "*in respect of*" a debt is a wider concept than rights, title and interest "*under*" a debt.

19. Whereas an assignment of rights, title and interest "*under*" amounts owing under any Supply Contract would (in the absence of contrary indications in the remainder of the agreement or the circumstances in which it was entered into) suggest that the subject matter of the assignment was limited to the right to be paid the Supply Receivable, the assignment of rights, title and interest "*in respect of*" any amounts owing under any Supply Contract indicates that the subject matter of the assignment is broader and extends to rights, beyond the mere right to be paid, which are connected with that right.

20. The parties having used the phrase "*rights ... in respect of*", as opposed to the narrower concept of "*rights ... under*" in identifying the subject matter of the assignment, it is necessary to give effect to the words they have chosen when construing the contract. A construction which ignored those words should in my view be rejected. In addition, the fact that the subject matter is defined broadly as "*rights*" in respect of, and not the narrower concept of "*contractual rights*" should

– 8 –

also be recognised. To do otherwise would be to add words into the agreement that are not there.

21. In particular, OWBFE's right, title and interest in any maritime lien that arises as security for the payment of amounts owing under the Supply Contract is, in my view, clearly one of its "*rights*" in connection with the amount owing under the Supply Contract, i.e. one of its "*rights*" in respect of the Supply Receivables. That is so whether the lien arises pursuant to the general law or pursuant to rights granted by the contract. A reasonable person, with the background knowledge reasonably available to the parties would in my opinion have understood the reference to "*all rights ... in respect of*" the Supply Receivables to include such rights of security in relation to the Supply Receivables of which OWBFE had, or later acquired, the benefit.

22. This conclusion is reinforced by the fact that:

(1) upon the security becoming enforceable, the Security Agent is empowered to exercise any of the rights of OWBFE "*in connection with*" any Security Asset. Security Asset is defined as all "*assets and rights, title and interest of [OWBFE] which are the subject of a security created by this Deed*", and "asset" includes "*present and future properties, revenues and rights of every description*"; and

(2) any receiver appointed by the Security Agent, by clause 13.14(a) of the Security Agreement (or the Security Agent itself, pursuant to clause 12.5 of the Security Agreement) is empowered to "*do all acts and things which he may consider desirable or necessary for realising any Security Asset*" and to exercise in relation to any Security Asset "*all the powers, authorities and things which he would be capable of exercising if he were the absolute*

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

– 9 –

*beneficial owner of that Security Asset*".

23. The provisions referred to in the preceding paragraph indicate that it was the intention of the parties to the Security Agreement that ING (either itself or via a receiver) would be able, to the fullest extent possible, to exercise any rights which OWBFE itself would have had to realise any amount owing under a Supply Contract.

24. In this regard, it is pertinent to note that an alternative construction whereby the right to payment was assigned to ING, but a right of enforcement in respect of such payment (*e.g*., via the maritime lien) was retained so as to be exercisable only by the assignor, would make little commercial sense, in circumstances where at all times following the assignment it is ING and not the assignor that has the principal economic interest in recovering the debt.

25. My view is not affected by the wording in either clause 2.4 (dealing with the assignment of rights in respect of "Insurance Rights") or clause 2.5 (dealing with the assignment of rights in respect of "Brokerage Receivables"). In both cases, the same wording – "*rights ... in respect of*" – is used, and nothing in them suggests any limitation is intended on the breadth of that phrase, whether as it applies in clause 2.3, or in clauses 2.4 and 2.5.

26. Nor is my view affected by the fact that the only notice required to be given pursuant to the Security Agreement is to the debtor, and there is no requirement to notify any third party, since the only notice requirement under English law, in order to obtain priority over others interested in the rights granted by a counterparty, whether those rights be purely contractual or rights over property of the counterparty, is to give notice to the counterparty.

27. The conclusion I have expressed above is also consistent with the purpose of the Security Agreement, as explained in the following paragraphs.

28. The purpose of the Security Agreement as a whole (and the assignment

– 10 –

constituted by clause 2.3 in particular) was to provide security to ING (as security agent for the lenders under the Credit Agreement), for OWBFE's liabilities to the lenders under the Credit Agreement.

29.     It is the over-arching purpose of any security to provide the security taker with recourse to assets of the security giver as a means of discharging the liabilities of the security giver to the security taker.  In this case, the relevant assets of OWBFE to which ING was given recourse included all of OWBFE's "*rights, title and interest in respect of the Supply Receivables*", in other words (substituting the definition of Supply Receivables), all of its rights, title and interest in respect of any amount owing or to be owed to OWBFE under any Supply Contract.

30.     ING's ability to have recourse to amounts owing under Supply Contracts in order to discharge OWBFE's indebtedness to the lenders depends upon being able to realise such amounts.  It is consistent with the over-arching purpose of the security granted by the Security Agreement that any and all rights which OWBFE has which enable it to realise the amounts owing under a Supply Contract are vested in ING as security taker.  A maritime lien (or any other security interest which OWBFE had in respect of the amounts owing under Supply Contracts) is integral to OWBFE's ability to realise amounts due under Supply Contracts. Accordingly, the conclusion that the maritime lien is within the category of "*rights … in respect of*" the Supply Receivables and thus assigned to ING is within the plain language of and consistent with the purpose of the Security Agreement.

31.     The Sales Order Confirmations issued by OWBFE, including the Terms and Conditions, and the invoices issued by OWBFE to China Navigation, together constitute Supply Contracts, as defined in clause 1.1 of the Security Agreement.

32.     Pursuant to said clause 1.1, any amounts owing to OWBFE under the invoice are Supply Receivables within the meaning of such term as it is used in the

– 11 –

Security Agreement.

33. Accordingly, under English law applicable to the Security Agreement, OWBFE has validly and absolutely assigned to ING all of OWBFE's right to receive payment of amounts owed for the bunkers delivered to the Vessels, as well as OWBFE's right to enforce any maritime lien arising in favour of OWBFE as security for the payment of such amounts.

34. I am also asked to consider whether ING, in acquiring OWBFE's "*rights … in respect of*" the Supply Receivables also assumed any obligations of OWBFE to Dolphin.

35. In my view the answer to this question is clearly no, for the following reasons.

36. First, the terms of the Security Agreement provide solely for the assignment of "*rights*" in respect of the Supply Receivables, and Supply Receivables are defined as the amounts owing "*to*" OWBFE. There is no possible construction of the Security Agreement under which the subject matter of the assignment extends to *obligations* owed *by* OWBFE to another party. (I note that, in any event, OWBFE sub-contracted for the supply of the bunkers with OW USA, which in turn sub-contracted with Dolphin, such that OWBFE did not itself have any obligations to Dolphin.)

37. Second, it is clearly established in English law that an obligation of a contracting party cannot be transferred to another by assignment, but can only be transferred by a novation of the contract, which requires the agreement of three parties, being both original contracting parties and the transferee. A recent succinct statement of this proposition is to be found in *Quest Advisors Limited, Sharriba Limited v Thomas Bernard McFeely, Conal Derek McFeely*[7], where, at paragraph

---

[7] [2009] EWHC 2651 (Ch).

– 12 –

DECLARATION OF ANTONY JAMES ZACAROLI QC
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF ING BANK N.V.

CASE NO. 8:15-cv-00859-JLS-DFM

17, the deputy Judge said: "*In law the transfer of the obligations owed under a contract cannot be achieved by the act of the party who owes those obligations "assigning" them to another. The agreement of the party to whom the obligations are owed is required, as well as of the party taking on the obligations. The process, requiring all three parties, is one of novation.*"

38. This means that, while an assignee will take the assignment subject to "equities", such that a cross-claim which operates as a set-off may in certain circumstances be raised by the debtor against the assignee,[8] any other claim – even one asserted by the debtor – against the assignor is not transferred to, and may not be asserted against, the assignee; see, for example, *Pan Ocean Shipping Co Ltd v Creditcorp Ltd*[9], in which (a) owners of a vessel (Trident) assigned the receivables due under a time charter to its lenders (Creditcorp); (b) this included the assignment of a sum paid in advance for a third period of hire; (c) the vessel turned out to be "off-hire" during the third period. The House of Lords concluded that, while the charterer (Pan Ocean) had a claim against Trident for repayment of the hire paid in advance for the third period, no claim lay by Pan Ocean against Creditcorp: "*…although the benefit of the contract debt had been assigned to Creditcorp, with the effect that payment to Creditcorp by Pan Ocean constituted a good discharge of the debt, nevertheless the burden of the contract remained upon Trident.*"[10]

39. *A fortiori*, an assignment of rights under a contract between A (the assignor) and D (the debtor) cannot effect a transfer of obligations owed by the assignor to C under a separate contract.

---

[8] See Chitty on Contracts, 32nd ed., paragraph 19-071.

[9] [1994] 1 WLR 161.

[10] Above, per Lord Goff of Chieveley at p.165B-C.

– 13 –

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
ONE WORLD TRADE CENTER, SUITE 1800
LONG BEACH, CALIFORNIA 90831-1800
(562) 435-2626

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I executed this declaration on December 8, 2016, at South Igman, London.

_____
Antony James Zacaroli QC

– 14 –

DECLARATION OF ANTONY JAMES ZACAROLI QC  
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT  
OF ING BANK N.V.

CASE NO. 8:15-cv-00859-JLS-DFM

# ANNEX

## Extract from the speech of Lord Hoffmann in *Investors Compensation Scheme v West Bromwich Building Society*

*"(1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.*

*(2) The background was famously referred to by Lord Wilberforce as the "matrix of fact," but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.*

*(3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of this exception are in some respects unclear. But this is not the occasion on which to explore them.*

*(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of*

– 15 –

*the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax: see Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd. [1997] A.C. 749.*

*(5) The "rule" that words should be given their "natural and ordinary meaning" reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. Lord Diplock made this point more vigorously when he said in Antaios Compania Naviera S.A. v. Salen Rederierna A.B. [1985] A.C. 191, 201:*

> 'if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense.'"

– 16 –

DECLARATION OF ANTONY JAMES ZACAROLI QC  CASE NO. 8:15-cv-00859-JLS-DFM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF ING BANK N.V.