1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

J. Stephen Simms
Simms Showers LLP
(admitted *pro hac vice*)
jssimms@simmsshowers.com
201 International Circle, Suite 250
Baltimore, Maryland  21030
Telephone:  410-783-5795
Facsimile:    410-510-1789

Gary R. Clouse (Bar No. 111055)
gclouse@icclawfirm.com
ISAACS, CLOUSE, CROSE & OXFORD, LLP
3110 Main Street, Suite 210
Santa Monica, California 90405
Telephone:  310-458-3860
Facsimile:    310-395-9880

Attorneys for
Dolphin MARINE FUELS, LLC

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| CHINA NAVIGATION CO. PTE LTD., | Case No.: 8:15-CV-00859 |
| Plaintiff, | **IN ADMIRALTY** |
| vs. | **DOLPHIN MARINE FUEL'S MEMORANDUM OF LAW OPPOSING ING BANK N.V.'S SUMMARY JUDGMENT MOTION** |
| DOLPHIN MARINE FUELS, LLC; O.W. BUNKER FAR EAST (S) PTE LTD.; O.W. BUNKER USA INC.; and ING BANK N.V., | |
| Defendants. | Date: January 27, 2017<br>Time: 2:30 p.m.<br>Crtrm: 10-A<br>Judge: Hon. Josephine L. Staton |

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 1

Complaint Filed: June 2, 2015

# TABLE OF CONTENTS

| | | |
|---|---|---|
| | Table of Contents | 2 |
| | Table of Authorities | 2 |
| I. | Argument | 4 |
| | A. ING Has No Claim to a Maritime Lien for the Bunkers that Dolphin Provided to the Vessels | 6 |
| | B. ING Is Not Assignee of the $87,165.30 Due Dolphin and is Not Entitled to a Maritime Lien Under the Security Agreement | 11 |
| II. | Conclusion | 20 |

# TABLE OF AUTHORITIES

*Arnold v. Britton*
[2015] UKSC 36; [2015] 2 WLR 1593. …..………………………………………14

*Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty*
608 F.2d 197 (5th Cir. 1979)…..……………………………………………….9

*Bominflot, Inc. v. M/V Henrich S,*
465 F.3d 144 (4th Cir. 2006)….…………………………………………….12

*In re Metromedia Fiber Network, Inc.,*
335 B.R. 41 (Bankr. S.D.N.Y. 2005)..…………………………………………3

*Lake Charles Stevedoring v. M/V PROFESSOR VLADIMIR POPOV,*
199 F.3d 220 (5th Cir. 1999)……………………………………………..9, 10

*Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*
869 F.2d 473 (9th Cir. 1988)……………………………………………8

*Tramp Oil and Marine, Ltd. v. M/V Mermaid I*
805 F.2d 42 (1st Cir. 1986) ..……………………………………………………11

## **STATUTES/REGULATIONS**

46 U.S.C. § 31301 *et se*q……………………………………………..4, 9, 10, 11

# **ARGUMENT**

This Court should deny ING's Motion for Summary Judgment (ECF 39). ING is not entitled to any recovery for the bunkers that Dolphin provided to the Vessels and for which ING never paid Dolphin. To find in favor of ING is essentially allowing the theft of the funds/bunkers that are still owed to Dolphin.

All agree that Dolphin provided the bunkers to the Vessels and no one ever paid Dolphin for them.  Dolphin's Terms and OW's Terms (which incorporate Dolphin's Terms) govern the bunker sale and expressly provide for Dolphin's direct contractual claims for Dolphin against OW and China Navigation (Simms Ex. 1 (Dolphin's Terms); ECF Doc. 42-3 (OW's Terms)). OW served as Dolphin's agent for the order from China Navigation to Dolphin through OW's sales terms. (*Id.*).

Awarding the $87,165.30 from the Registry Funds to any other party than Dolphin, through a maritime lien *in rem* against the Vessels or otherwise, simply would not comport with the agreement between the parties, the Commercial Instruments and Maritime Lien Act ("CIMLA"), and the relevant case law. Dolphin is the only party entitled to a lien *in rem* against the Vessels and the award of the amount of its provision of the bunkers to the Vessels.  ING provided **nothing** to the Vessels, despite its inequitable claim to the funds due and owing to Dolphin.  As such, Dolphin is the only party that is actually entitled the $87,165.30

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 4

(plus interest and costs, as allowable) for the bunkers it provided to the Vessel from the Registry Funds.

Dolphin provided the bunkers pursuant to Dolphin's Terms.  Dolphin has **never** been paid for these bunkers by ING or any other party.  ING **never** paid any party for the bunkers.

As detailed below, the OW Bunker Group Terms and Conditions of Sale for Marine Bunkers, Edition  2013 (the "OW Terms"), through which ING purports to claim a maritime lien, explicitly incorporate Dolphin's Terms and make those Terms applicable to the bunker transaction, as well as to all of the parties involved (OW, the Vessel, and China Navigation).   (See ECF Doc. 42-3).  Dolphin's Terms are also applicable to ING (if ING was assigned anything, which it in fact was not, as Dolphin also details herein), as it purports to stand in the shoes of OW.

ING, despite being bound by Dolphin's Terms, shamelessly contends that it has a claim to the Registry Funds as the purported assignee of OW's claimed right to payment – even though OW provided nothing of value to the bunker transaction at issue and even though title to the bunkers never passed from Dolphin. There is **no** maritime lien assigned to ING per the Security Agreement upon which ING bases its claim as Security Agent.

Furthermore, the equitable principles at the core of admiralty law further provide for payment to Dolphin for the bunkers Dolphin provided and for which

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 5

ING **never** paid anyone.  To award ING the $87,165.30  it claims it is entitled from Dolphin' provision of the bunkers to the Vessels would be to upend the intended result of all parties to the original transaction as well as blatantly ignore the long-standing principle of equity in admiralty law.

For the reasons set out more fully below, ING does not have a maritime lien against the Vessel.  Dolphin is the only party that is entitled to recover directly for the bunkers that Dolphin provided to the Vessel.

## I.   <u>ING Has No Claim to a Maritime Lien for the Bunkers that Dolphin Provided to the Vessel</u>

On behalf of China Navigation, the owner of the SHENGKING, O.W. Bunker Far East (S) Pte Ltd. ("OW Singapore"), acting through its subsidiary, O.W. Bunker USA Inc. ("OW-US"), placed an order to Dolphin for bunkers (marine fuel) for the SHENGKING on October 17, 2014.  Dolphin confirmed the sale, including the following with its mandatory Terms and Conditions (Simms Ex. 1):

> 7. PAYMENT
> Payment **shall be made to Seller in U.S. Dollars without discount or offset within thirty (30) days of the date of delivery into barge or vessel for Buyer's account**.  All payments due if not received by Seller within thirty (30) days shall bear interest at the rate of one and one-quarter percent (1.25%) per month or any part thereof.
>
> *   *   *

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 6

10. COLLECTIONS

**Deliveries of marine fuel hereunder are made** not only on the credit of the Buyer but **also on the faith and credit of the vessel which uses the marine fuel and it is agreed that Seller will have and may assert a lien against such vessel for the amount of the delivered price of said marine fuel**. In the event of any breach of this Contract or otherwise, or in the event Buyer becomes bankrupt or its financial condition becomes unsatisfactory to Seller, then Seller shall have the right, in addition to any other rights or remedies that may have, to suspend deliveries hereunder, and Seller shall be entitled to terminate this Contract. In the event of a dispute between the parties hereto regarding the subject matter of this Contract, and legal action is resorted to in order to enforce terms and/or payments, purchaser shall be liable for any and all reasonable attorney's fees and court costs.

(Emphasis added).  The confirmation from OW to Owners stated as follows:

TERMS:
The sale and delivery of the marine fuels **described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers**. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as ´Buyer´ and to O.W. BUNKER R EAST (S) PTE LTD. as ´Seller´.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

(Emphasis added, **Simms Ex. 4**).  As detailed below, OW's Terms including their clause "L.4" – which expressly incorporated Dolphin's Terms, above, into the contract and made OW Dolphin's agent for the purpose of making Dolphin's Terms effective.

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 7

On October 26, 2014, Dolphin delivered to the SHENGKING at Los Angeles, California about 100.19 metric tons of bunker fuel. (Simms Ex. 2). The bunker delivery notes for both provisions were signed by the Chief Engineer of the respective vessel.  (*Id.*).  The note included the following emphasizing Dolphin's maritime lien rights:

> DISCLAIMERS: No disclaimer stamp of any type or form will be accepted on this bunkering certificate, nor should any such stamp be applied, will it alter, change or waive Dolphin's Maritime Lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this transaction.

(*Id.,* Simms Ex. 2).

On or about October 26, 2014, Dolphin invoiced OW-US $87,165.30 for the bunker provision to the SHENGKING.  (*Id.*).  Despite demand, Dolphin has never been paid for its provision of bunkers to the SHENGKING.  China Navigation has deposited the $87,165.30 (the "Disputed Principal Amount") into the registry on the Court.  (Compl. (Doc. 1), ¶ 15).  Dolphin is owed this principal amount of $87,165.30, plus interest. (Simms Ex. 2).

When Dolphin physically supplied the China Navigation Vessel, it expressly did so pursuant to its General Terms and Conditions.  Furthermore, the sale agreement between OW and the Vessel was governed by the OW Bunker Group Terms and Conditions of sale for Marine Bunkers, Edition 2013 (the "OW

Terms").  The OW Terms specifically incorporate and are superseded by Dolphin's

Terms pursuant to Clause L.4 of the OW terms, which provides as follows:

> (a) **<u>These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions. In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.</u>**

> (b) Without prejudice or limitation to the generality of the foregoing, in the event that the third party terms include:

>> (i) A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.

>> (ii) Any additional exclusion of liability clause, then same shall be incorporated mutatis mutandis into these.

>> (iii) A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions.

> (c) It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party.

(ECF Doc. 42-3) (emphasis added).

According to the OW Terms, Dolphin's Terms are binding on OW and the

Vessel.  (*Id.*)  Pursuant to its invoices, Dolphin is owed the principal amount of

$87,165.30, plus interest and costs.  Because Dolphin's Terms are binding on OW

and the Vessels pursuant to the OW Terms, only Dolphin has an enforceable maritime lien against the Vessels for the $87,165.30 it is owed, plus interest.

ING's claim for a maritime lien flies in the face of the language of its own contract. By Clause L.4 of the OW terms, Dolphin' terms are incorporated into all transactions with the Vessels and its charterers/owners. ING essentially asks the court to ignore this provision of its own terms, but that would be contrary to the well-established case law. *See, e.g., Tri-Union Seafoods, LLC v. Starr Surplus Lines Ins. Co.*, 88 F. Supp. 3d 1156, 1164 (S.D. Cal. 2015) ("[C]ourts must interpret contracts as a whole and in a manner that does not render any clause or provision superfluous."); *Guidiville Band of Pomo Indians v. NGV Gaming, LTD.*, 531 F.3d 767, 789 (9th Cir. 2008) (quoting Restatement (Second) of Contracts § 203(a) cmt. b (1979)) ("it is assumed in the first instance that no part of [a contract] is superfluous."); *Brinderson-Newberg Joint Venture v. Pac. Erectors*, 1992 U.S. App. LEXIS 16184, at *15 (9th Cir. July 20, 1992) (interpretations that "would render other portions of [a] contract meaningless" "violat[e] a fundamental rule of contract interpretation").

Clause L.4 of the OW Terms expressly incorporates Dolphin's terms in all aspects of the transaction with the ultimate buyer, the Vessel.  In recognizing that ING cannot have a maritime lien for fuel which Dolphin provided and for which Dolphin was never paid, this Court should not ignore the clear holding from *Ken*

*Lucky* that a supplier "need not establish agency between [a broker] and [a charterer in control of the vessel] to fall within the scope of one entitled to a maritime lien under the [Commercial Instruments and Maritime Lien Act]." *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473 (9th Cir. 1988).   Even though this requirement is not necessary, it is clear that the bunkers supplied by Dolphin were on the authority of the Vessel because the Chief Engineer of the Vessel signed the BDR.   The BDR, as set out above, expressly states Dolphin's maritime lien rights.

Fundamentally, however, even though *Ken Lucky* does not require it, OW's Clause L.4 **does** establish the agency, because through L.4, again, OW undertakes to make Dolphin's Terms effective – which must be, for OW to act as agent for Dolphin for the purpose of Dolphin providing the bunkers to the Vessel, on the order – through OW as agent – of the Vessel's owner or charterer.

Similarly, through OW's Clause L.4, payment (as Dolphin's Terms require) is for Dolphin's bunkers, to come **directly** to Dolphin, also as set out above, "without discount or offset."

ING's argument also mischaracterizes the intent of Commercial Instruments and Maritime Lien Act ("CIMLA").   To award ING the $87,165.30 it claims it is entitled from Dolphin's provision of the fuel to the Vessel would be to upend the intended result of all parties to the original transaction as well as blatantly ignore

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 11

the long-standing principle of equity in admiralty law.  The fundamental purpose

of CIMLA is to protect materialmen, and it is to be liberally construed to allow

materialmen and suppliers (**not** third party intermediaries as OW is here) to claim a

maritime lien:

> We view the legislative history of these sections to mandate a more
> liberal application than that which existed prior to the 1971
> amendments to the Maritime Lien Act. Our review leads us
> inexorably to the conclusion that it was the intent of Congress to make
> it easier and more certain for stevedores and others to protect their
> interests by making maritime liens available where traditional services
> are routinely rendered.

*Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 201 (5th Cir.

1979).  Dolphin is the only party entitled to a lien *in rem* against the Vessel and the

award of the amount of its provision of the bunkers to the Vessel.  ING (and OW)

provided **nothing** to the Vessel, despite its inequitable claim to the funds due and

owing to Dolphin.  As such, Dolphin is the only party entitled to the $87,165.30

(plus interest and costs, as allowable) in bunkers that it provided to the Vessel.

ING's reliance on *Lake Charles Stevedoring v. M/V PROFESSOR

VLADIMIR POPOV*, 199 F.3d 220 (5th Cir. 1999) to claim its purported maritime

lien rights is misplaced.  The holding in *Lake Charles* about the relationship

between the parties in the contractual chain cannot be reconciled with longstanding

and systemic bunker industry practice nor the fundamental purpose of CIMLA to

protect materialmen.  The Court held that:

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 12

> We are persuaded by our review of these cases that it is not whether an intermediary can be expected to supply the necessaries itself that distinguishes instances in which the actual suppliers have liens, but it is rather the nature of the relationship between each pair of entities involved in the transaction at issue (e.g., agent v. independent contractor).

*Lake Charles*, 199 F.3d at 230.  Yet, the structure of the bunkering industry is such that each intermediary in the chain protects its turf by not revealing its contacts up and down the chain.  If they held themselves out as brokers, and linked the principals together, the principals need only carve out the middle man in the next transaction.  Instead, the intermediaries shield their contacts by creating separate-contractual relationships above and below them.  Application of the above proposition to the bunker market structure virtually forecloses a materialman from asserting a maritime lien without being in direct contractual privity with the owner, charterer, or other person authorized by the Owner.  In every other case, Vessel Interests and intermediaries' self-interest make it easy for each to declare that the intermediary does not serve as agent for Vessel Interests.  Meanwhile, the only party that supplied tangible property is out the value of that property.

Lake Charles only addresses the selection requirement in the context of the general contractor/subcontractor line of cases.  That criteria is not workable in the context of the middle-man line of cases, where physical suppliers are tasked with delivering goods and services on short notice to meet operational requirements.  Adopting "selection" as the criteria for awarding a maritime lien

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 13

virtually forecloses such liens favoring American materialman, which is completely contrary to CIMLA's underling purpose, which is to protect American materialman providing necessaries to foreign vessels in American ports. *Tramp Oil and Marine, Ltd. v. M/V Mermaid I,* 805 F.2d 42, 46 (1st Cir. 1986):

> The primary concern of the Federal Maritime Lien Act is the protection of American suppliers of goods and services. See H. Rep. No. 92-340, 92nd Cong., 1st Sess., reprinted in 1971 U.S. Code Cong. & Ad. News 1363-65; *Gulf Trading & Transportation Co. v. The Vessel Hoegh Shield,* 658 F.2d 363, 367 (5th Cir. 1981), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982)("The congressional intent is that an American supplier of goods, services or necessaries to a foreign vessel obtains a maritime lien in the vessel when the goods or services are supplied or performed in the United States.").

Denying an American fuel supplier a maritime lien, in favor of awarding one to a party who actually provided **no** value to the underlying transaction (OW, and claiming through it, ING), financially harms that supplier and creates a disincentive for it to supply goods on credit to foreign ships in the future. That disincentive further harms maritime commerce (1) by limiting the number of necessaries suppliers that will provide such goods on credit (driving up the cost of such goods), (2) by leading to pre-payment requirements, which drives up transactional costs and slows the pace of maritime commerce, and (3) by ultimately reducing the number of American suppliers of necessaries. Such outcomes defeat CIMLA's goal of protecting American materialman and promoting U.S. maritime commerce.

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 14

Recognizing ING's claim for a maritime lien against the Vessels for the bunkers that Dolphin provided and was never paid for would disregard the intentions of the parties to the underlying transaction, as well as the realities of the bunkering industry, which CIMLA expressly seeks to uphold.

## II.   ING Is Not Assignee of the $87,165.30 Due Dolphin and is Not Entitled to a Maritime Lien Under the Security Agreement

ING claims here as "Security Agent" (not as principal), having received through "Finance Documents" a purported assignment of "Supply Receivables," which it here alleges to include the $87,165.30, which is actually owed to Dolphin for the bunkers that Dolphin alone provided to the Vessel and for which Dolphin was never paid.

Significantly of course, ING claims to take all the benefits (the account owing) but not the obligations (paying Dolphin) – where – there would be no benefits at all had Dolphin not provided the bunkers to the Vessel.

Under ING's Security Agreement,  however:

> Supply Receivables means **any amount owing, or to be owed**, to a Receivables Chargor [OW here] or a Danish Receivables Chargor under any Supply Contract.

(ECF Doc. 40-4).  A "Supply Contract" under the Security Agreement is defined as follows:

> Supply Contract means any one-time contract, any contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the Group, **in each case governed by**

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 15

**English law** and relating to the sale of oil products traded by the Group . . . .

(*Id.*) (emphasis added).  The Security Agreement also defines "Security Assets" to be:

> [A]ll assets and rights, title and interest of each Receivables Chargor . . . .

As set out above, the $87,165.30 is the amount that China Navigation and the OW Entities owe Dolphin.  It is not the amount owed to any of the OW Entities ("Chargor").  The deposit is not an amount "owing or to be owed" to the OW Entities; the bunkers are not an asset giving rise to any payment to which the OW Entities have a right.  The deposit is not for any "receivable" owed or belonging to the OW Entities.  ING therefore never took assignment of Dolphin's $87,165.30 (or of Dolphin's bunkers that the deposit stands for) and has no rights to the deposit here under the "Security Agreement" or otherwise.

In the same way, ING never took assignment of maritime lien rights *in rem*, either.  Furthermore, English law does not recognize a maritime lien for necessaries.  *Bominflot, Inc. v. M/V Henrich S*, 465 F.3d 144, 147 (4th Cir. 2006).  ING takes no assigned maritime lien claim under its own Security Agreement because it only takes claims under "Supply Contract[s] . . . in each case governed

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 16

by English law".[1]  Such "Supply Contract[s]" under English law by definition cannot provide for maritime liens.

Notably, English solicitors have opined in related cases involving ING's purported assignment that the "purported assignment of OW[]'s right, title and interest in respect of the amounts owing under the Supply Contracts was, at best, an equitable assignment.  That means that the assignment would be recognised in equity, but not at law."[2]

---

[1] If the amounts owed Dolphin are somehow "Security Assets," however, (which they are not as detailed above), the OW Entities were in breach of the Security Agreement.  Under Security Agreement § 3.1 (a) "[e]ach Receivables Chargor …represents and warrants to each Finance Party that (i) it is the sole legal and beneficial owner of its Security Assets; (ii) its Security Assets are free from any Security…and any other rights or interests in favor of third parties…."  Dolphin confirms here that it owns and holds rights to the principal amount of $87,165.30. ING either made no effort to confirm that the OW Entities were in compliance with the Security Agreement's "free and clear" conditions, or knowing of Dolphin's and other superior claims, decided to overlook the conditions. (ECF Doc. 40-4).

[2] *See* Declaration of Peter John Sibley MacDonald Eggers, practicing barrister and a Queen's Counsel in the Bar of England and Wales, filed in *Bonny Gas Transport Limited v. O.W. Bunker Germany GmbH et al* in the U.S. District Court of the Southern District of New York (Case No. 1:14-cv-09542-VEC), a related OW / ING interpleader case also involving a physical supplier. (Simms Ex. 3). Mr. Eggers was asked to opine on whether any maritime lien which OW was entitled to assert over the vessels has been assigned to ING pursuant to clause 2.3(a) of the Security Agreement (which is governed by English law pursuant to Clause 20 of the Security Agreement), whether a maritime line is capable of assignment under English law, and whether a maritime lien was created by OW's terms and conditions. (*Id.*)

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 17

Furthermore, clause 2.3(a) of the Security Agreement does not transfer any property rights, which means it also does not transfer any purported maritime lien rights to ING:

> **On its true construction, clause 2.3(a) of the Security Agreement does not assign a maritime lien, if it exists, exercisable by OWB against the vessels.** The assignment purportedly effected by that clause extends to contractual rights under the relevant Supply Contracts, and possibly statutory rights which arise as a necessary consequence of that contract, against the contractual counterpart. A maritime lien is not such a right because (a) the maritime lien is in essence a claim against the vessel, (b) the maritime lien arises independently of contract, (c) the maritime lien arises independently of any personal liability of the shipowners to the lienee, and (d) **the maritime lien creates a proprietary interest in the vessels and clause 2.3(a) does not purport to transfer property rights.**

(ECF Doc. 40-4) (emphasis added). Thus, even if the Security Agreement is recognised as an assignment in equity under UK law, it still is incapable of assigning any maritime lien rights because they would be outside the scope of the rights that the Security Agreement attempts to assign.

As to the construction of clause 2.3(a) of the Security Agreement upon which ING relies for the basis of its claim, assuming that OW would have ever had a maritime lien (and had paid the physical supplier, Dolphin, for the bunkers it provided to the Vessel),

> **any maritime lien which OWB may exercise against the vessel[] is not within the scope of the assignment in clause 2.3(a) because…[i]f the parties intended to include maritime liens within the scope of the assignment under clause 2.3(a), the parties would have expressly referred to such liens.** However, no such reference

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 18

is made in clause 2.3(a). Mr. Zarcoli QC's interpretation is putting a great deal of weight on the words "in respect of" in circumstances where no such reference is made to maritime liens.

(Simms Ex. 3) (emphasis added).  Remarkably, ING actually claims it could be assigned a right to which there is absolutely no reference to in the entire Security Agreement. This simply does not comport with the principles of contract interpretation established under English law that "the parties' choice of language will inform any reasonable reader what the parties objectively intended and notions of commercial purpose should not be readily used to disturb that objectively-ascertained intention."  (*Id.*) (citing *Arnold v. Britton* [2015] UKSC 36; [2015] 2 WLR 1593).

Contrary to the well-established principles under English law, ING asks this Court to ignore the plain language of the Security Agreement and read into it a right to an assignment that simply does not exist and was not even referenced by any of the parties to the Security Agreement in the first place. To do so would render the language of the Security Agreement pointless and provide for a maritime lien right in contract, which simply does not exist otherwise.

Importantly, English solicitors distinguish that "Clause 2.3(a) [of the Security Agreement] does not purport to assign property rights [as an *in rem* lien], merely contractual rights."  (*Id.*).  According to the same English solicitor, under English law, "the general rule is that **such [maritime] liens are not capable of**

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 19

**assignment or transfer**, because the maritime lien is treated as a personal

privilege for the sole benefit of the maritime lienee.  This is a principle which has

long been recognised as a principle of law….”  (*Id.*).  Thus, even assuming

*arguendo* that ING is the assignee of OW, as a matter of law, it certainly is **not** the

assignee of any maritime lien rights against the Vessel:

> I appreciate that **the maritime lien which may arise on the facts of this case, by reason of the supply of bunkers to the vessel[], is not a maritime lien recognised by English law**. Insofar as they are necessaries, **the supply of bunkers would create a statutory claim *in rem***. That said, by reason of the status of the maritime lien under U.S. law and its operation *in rem* against the vessel[] independently of contract and of any personal liability on the part of the shipowners, I consider that **any such maritime lien is not capable of assignment as a matter of English law**.

(*Id.*) (emphasis added).  Thus, no maritime lien right claimed by ING exists under

UK law nor could it have been assigned under the language of the Security

Agreement.

## CONCLUSION

ING is not entitled to a maritime lien for Dolphin' provision of the bunkers

to the Vessels. ING is not the assignee of Dolphin's $87,165.30 under the terms of

the Security Agreement. ING was also never assigned a maritime lien under the

language of the Security Agreement.  For the reasons set forth above, this Court

now should deny ING summary judgment.

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 20

Dated: January 7, 2016.

*/s/ J. Stephen Simms*                    Gary R. Clouse (Bar No. 111055)
Simms Showers LLP                          gclouse@icclawfirm.com
J. Stephen Simms                           ISAACS, CLOUSE, CROSE &
(admitted *pro hac vice*)                  OXFORD, LLP
jssimms@simmsshowers.com                   3110 Main Street, Suite 210
201 International Circle, Suite 250        Santa Monica, California 90405
Baltimore, Maryland  21030                 Telephone:  310-458-3860
Telephone:  410-783-5795                   Facsimile:    310-395-9880
Facsimile:    410-510-1789

*Dolphin Marine Fuels, LLC Counsel*

MEMORANDUM OF LAW SUPPORTING
MOTION FOR SUMMARY JUDGMENT – 21